## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KAREN DENISE CLARK, | ) | CASE NO. 4:08CV3248 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| UNION PACIFIC RAILROAD, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Defendant's Motion for Summary Judgment (Filing No. 49) and Plaintiff's Motion for Summary Judgment (Filing No. 63). As set forth below, Defendant's Motion is granted and Plaintiff's Motion is denied.

### *BACKGROUND*

Plaintiff Karen Denise Clark ("Clark") filed her Complaint in this matter on December 10, 2008. (Filing No. 1.) Liberally construed, Clark alleges that Defendant Union Pacific Railroad ("UP") discriminated against her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"). (Filing No. 1 at CM/ECF p. 7.)[1] Clark also raised state claims pursuant to the Nebraska Age Discrimination in Employment Act and the Nebraska Fair Employment Practice Act. (Filing No. 1.) However, the court dismissed those state-law claims with prejudice on June 18, 2009, because they were barred by the applicable statute of limitations. (Filing No. 22.)

UP filed its Motion for Summary Judgment on November 20, 2009. (Filing No. 49.) In support of its Motion, UP filed an Index of Evidence, Brief, and Reply Brief. (Filing Nos.

---

[1]The court notes that the parties briefed issues relating to discrimination based on Plaintiff's race and sex. However, nowhere in her Complaint does Plaintiff allege discrimination based on her race or sex. (Filing No. 1.) The court will only address the claims raised in the Complaint.

50, 51, and 75.)  Clark filed two Briefs in opposition to the Motion, which are nearly identical, and an Index.  (Filings No. 68, 69, and 70.)  On February 3, 2010, after a lengthy extension of time, Clark filed her Motion for Summary Judgment.  (Filing No. 63.)  In support of her Motion, Clark filed a Brief, Index, Affidavit, and Reply Brief.  (Filing Nos. 64, 65, 66, and 76.)  UP filed a Brief, Index of Evidence, and an Affidavit in opposition to Clark's Motion.  (Filing Nos. 71, 72, and 73.)

The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1).  If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1).  Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations to evidence supporting the opposition.  *Id.*  "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response."  *Id.*; *see also* Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

UP submitted a statement of material facts in accordance with the court's Local Rules.  Further, UP submitted evidence which was properly authenticated by affidavit or sworn deposition testimony.  While Clark submitted more than 500 pages of documents, the only properly authenticated documents are her deposition and the exhibits discussed

2

therein.[2]  In light of this, both Motions are deemed fully submitted and the court adopts the following undisputed material facts, set forth by UP.

### RELEVANT UNDISPUTED FACTS

Background

1.      Clark was born June 4, 1958, and is now 51 years old.

2.      Clark worked as a crew dispatcher from 1982 to the present with the exception of February 2006 to October 2006, during which time UP promoted her to a manager of crew dispatching position.

3.      Clark discovered an open position for manager of crew dispatching on UP's "CNET," an employee web-site where promotional opportunities are posted, and applied for the same.

4.      Steven Kessler ("Kessler"), former Director of Planning and Support in CMS and now General Director Strategic Sourcing Supply Department; Julian Caldwell ("Caldwell"), previous Director of Operations for Crew Manager and now Director of IT Strategic Services; and Michael Brazytis ("Brazytis"), General Director of CMS; made the decision to offer Clark the position, which Clark accepted.

5.      On February 16, 2006, at age 48, Clark began working as a manager of crew dispatching.

6.      Clark was assigned as a manager of crew dispatching for the Western Region.

7.      Clark's supervisor was Patricia Anderson ("Anderson"), who was a Team Leader of Crew Dispatching and is now the Manager of Crew Support, and Kelly Mitchel ("Mitchel"), who is a Team Leader for Crew Dispatching.

---

[2]For instance, Clark submitted printouts from an unidentified computer system with items circled and unidentified notes written on the bottom (Filing No. 66 at CM/ECF p. 20), scribbles and notes on another unidentified printout (*id.* at CM/ECF p. 46), unidentified and unexplained drawings (*id.* at CM/ECF pp. 72-76), and various calendars and charts (*id.* at CM/ECF pp. 79-83).  None of these documents is properly authenticated.  Regardless, even if the court considered Clark's submissions, none of these documents directly or indirectly shows that Clark's age played any role in her demotion.

Job Duties of a Manager of Crew Dispatching

8.     Clark reviewed the job description prior to applying for the manager of crew dispatching position and understood the job's duties for which she would be responsible including the following: "[m]anage all processes, in a customer service environment, associated with assigning train and engine crew personnel to yard, local, and through freight trains to ensure uninterrupted train operations"; "[s]upervise and lead agreement work force of approximately 70 Crew Dispatchers in a customer service environment, provide necessary ongoing coaching, training, and counseling"; and "[m]onitor and regulate train, engine, and yard crew boards to ensure appropriate allocation of the [train, engine, and yard] labor force to meet manpower requirements for efficient train operations."

9.     Clark understood that she needed to accomplish the job duties listed in the manager of crew dispatching job description.

Clark's First Performance Evaluation as Manager

10.     On May 6, 2006, Anderson met with Clark to review her performance as a manager.  During the meeting, Anderson went over the areas of concerns with Clark as identified in her Performance Development and Review ("PDR").

11.     Clark received a rating of "below expectations" in four out of the seven categories in her PDR, including "Respect for Employees," "Commitment," "Accountability," and "Communication."

12.     Anderson informed Clark that "she need[ed] to take more time with each calling area to help her better learn the Western Region."  Clark admitted that she needed to learn the Western Region better.

13.     Anderson explained to Clark that she was "management now, so [Clark] must handle disagreements more professional," but Clark did not see any difference between being a management employee and union employee.

Clark's Behavior

14.     As a manager of crew dispatching, Clark understood that she needed to follow all the rules set forth by UP applicable to managers, including the dress code.

15.     UP personnel notified Clark on more than one occasion that she was in violation of UP's dress code.

16.     On June 11, 2006, Clark came to work wearing velour sweat pants with the words "baby girl" written across the seat of the pants.  Mitchel informed Clark that she was wearing inappropriate clothing for work, drove her home to change, and reviewed UP's dress code policy with her.  Clark knew that it was inappropriate clothing.

4

17.    Just three days later, on June 14, 2006, UP again determined that Clark violated the dress code.  On that date, Mitchel observed Clark wearing a shirt showing her mid-riff, and Anderson discussed Clark's inappropriate attire with her.  Clark did not agree that it was a problem to wear a shirt that showed her midriff when she raised her arms.

18.    On July 12, 2006, Clark confronted a crew dispatcher, Jim Brewer ("Brewer"), during a safety meeting in front of all of his co-workers.

19.    Anderson investigated this incident.  According to Brewer's account of the events, Clark loudly told Brewer twice that she could send him home and that "you people will respect me."

20.    Brewer began to cry and went to the men's bathroom.

21.    Clark followed Brewer to the men's bathroom, and waited near the door until he came out.

UP Places Clark on a Personal Development Action Plan

22.    On August 21, 2006, Clark met with David Martinez ("Martinez"), Director of Crew Dispatching who replaced Caldwell, to discuss her performance as a manager.

23.    During this meeting, Martinez placed Clark on a Personal Development Action Plan ("PDAP") and thoroughly reviewed it with Clark.

24.    Martinez cited specific instances and four different general areas of concern: a) unprofessional behavior; b) performance of manager duties; c) scheduling indifference; d) compliance to dress code.

25.    Martinez specifically referred to the incident with Brewer as an example of Clark's unprofessional behavior.

26.    Martinez discussed Clark's lack of familiarity with the Western Region, such as pools, extra boards, and hubs in Transportation Control System ("TCS") to "CMTS," which is a web application that is a crew management time keeping system.  CMTS was "newly. . . developed" and UP was implementing the new software in the Western Region first and then subsequently in the two other geographic regions.

27.    A UP manager of crew dispatching must have a good understanding of the pools, extra boards, and hubs in his or her geographic region because he or she must supervise crew dispatchers in assigning train, engine, and yard employees to trains from these areas.  If a manager of crew dispatching does not have a secure grasp of the terminology and locations for assembling and pulling crews, then he or she does not know where to pull crews when there are shortages, which causes delays in the movement of trains.

5

28.    All of the managers and crew dispatchers in the Western Region (and then in all the regions) had to learn CMTS.

29.    Clark was unable to memorize and recite the pools, extra boards, and hubs for TCS and CMTS.

30.    Clark never asked for any additional training.

31.    Martinez told Clark that she should write out the geographic areas of Western Region, because that was the way he learned all three regions: Western, Northern, and Southern.  Clark was Martinez's first and only manager of crew dispatching to have serious issues knowing and understanding her geographic region, pools, extra boards, and hubs.

32.    During the meeting, Martinez also referred to the fact that, since February 20, 2006, Clark worked 57 shifts with an additional manager instead of being able to perform her managerial duties on her own, which Clark refers to as 57 days of training.

33.    Typically, managers of crew dispatching have one week of on-the-job training before they are able to perform their management duties on their own.

34.    All managers of crew dispatching and crew dispatchers learned CMTS through on-the-job training typically in one day but at a maximum in three days.

35.    Martinez also discussed how Clark needed to report at least 15 minutes prior to the start of her shift to discuss outstanding issues with the exiting manager.

36.    Martinez wrote out and gave an action plan for Clark to accomplish, including: 1) immediately treating all employees with respect and prioritizing trains held and jobs blanked; 2) within 15 days, understanding/memorizing crew boards and geographic locations; 3) on a daily basis, listening to other managers giving their updates and have two daily reviews with Anderson and/or Mitchel and/or Martinez; and 4) maintaining professionalism.

37.    Martinez scheduled follow-up meetings to determine whether Clark was meeting the action points and improving.

38.    Approximately one month after Martinez placed Clark on a PDAP, on September 20, 2006, Anderson and Martinez met with Clark and informed her that she did not meet the expectations of her PDAP.

Clark's Behavior After the September 20, 2006, Meeting

39.    On September 28, 2006, Mitchel and Tony Leazenby ("Leazenby"), Team Leader of Northern Region, were called to the floor where Clark was the manager of crew dispatching.

6

40.     Clark was not on the floor, and the telephones were down.

41.     Crew dispatchers need their telephones to perform their job duties, and this was a serious incident when crew dispatchers could not perform their job duties.

42.     Clark reported the problem and went to another floor for a cup of coffee.

43.     Mitchel and Leazenby addressed the situation on the floor even though it was Clark's responsibility.

The October 5, 2006, Meeting

44.     On October 5, 2006, Anderson and Kessler met with Clark and gave her a letter from Brazytis outlining eight specific areas of needed improvement for Clark to adhere to and complete by October 31, 2006.

45.     Anderson and Kessler told Clark that if she did not improve in the identified areas by October 31, 2006, she would be terminated as a manager.

46.     After this meeting, Clark took a one-week vacation on a cruise.  From February 2006 to October 2006, Clark took a total of five weeks of vacation.

Clark's Termination as a UP Manager

47.     On October 31, 2006, Kessler and Martinez met with Clark.

48.     Kessler and Martinez asked Clark numerous questions, and Clark was unable to recite the home terminals, away-from-home terminals, pool boards, and extra boards in the Western Region.

49.     According to a document created by Martinez immediately after the October 31, 2006, meeting, Clark gave the following answers to Kessler and Martinez's specific questions about the geography of the Western Region: "I'll just take a guess"; "I could be wrong"; "I hope I'm right"; "My mind just went blank": "I'm really confused with West Colton"; "I'm going blank again"; "I get confused"; "I still struggle with this area [Pocatello]"; "I totally get confused with extra boards in Salt Lake City"; and "I can't figure it out."

50.     Because Clark was unable to meet the identified areas of her PDAP and the items listed in Brazytis's October 5, 2006, letter, Martinez and Kessler gave Clark a letter from Brazytis terminating her employment.

51.     Clark exercised her seniority rights and returned to her position as a crew dispatcher.

Comments Regarding Age Discrimination

7

52.   As to Clark's age discrimination claim, Clark alleges that it was "rumored" that Brazytis used the term "dinosaur" when referring to senior employees, but she admitted that she never heard Brazytis or anybody in UP's management use that term.

(Filing Nos. 50 and 51.)

## ANALYSIS

### I.   Standard of Review

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c).  See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir. 1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue.  Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999).  In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)).  "A mere scintilla of evidence is insufficient to avoid summary judgment." Id.  Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

8

must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II.      Plaintiff's ADEA Claim

Plaintiff claims that she was terminated because of her age in violation of the ADEA. (Filing No. 1.)  The ADEA makes it unlawful for employers "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.  29 U.S.C. § 623(a)(1).  The Supreme Court recently clarified the burden of proof in ADEA cases:

> We hold that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.  The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.

*Gross v. FBL Fin. Servs*, 129 S. Ct. 2343, 2352 (2009).  Stated another way, "'[t]o establish a claim under the ADEA, a plaintiff must show that her employer intentionally discriminated against her.'"  *Wagner v. Geren*, No. 8:08CV208, 2009 WL 2105680, *4 (D. Neb. July 9, 2009) (quoting *Ziegler v. Beverly Enters.-Minnesota, Inc.*, 133 F.3d 671, 675 (8th Cir. 1998)).  Evidence of age as the "but-for" cause "may be direct or circumstantial." *Gross*, 129 S. Ct. at 2351.

Here, Clark has not produced any evidence that her age was the cause of her demotion.  As set forth above, UP promoted Clark in February 2006, when she was 48 years old.  UP demoted her in October 2006, when she was 49 years old.  In the approximately nine months she served as a manager, UP determined, among other

performance-related issues, that Clark violated the dress code policy on at least two occasions and acted unprofessionally on at least two occasions, including one instance where she berated an employee and made him cry.  Most important, the undisputed evidence shows that Clark was never able to adequately familiarize herself with UP's Western Region, her region of responsibility.  On several occasions, UP requested that Clark memorize the necessary information relating to the Western Region and gave her many chances, over the course of several months, in which to do so.  Clark was never able to recite this information, which was critical to her job responsibilities as a manager.  In short, the undisputed evidence before the court shows that UP demoted Clark because of her poor work performance.

The only age-related evidence properly before the court[3] is Clark's deposition testimony that she heard "rumors" that UP General Director of CMS Brazytis used the term "dinosaur" in referring to senior employees, which is evidence of age discrimination.  However, as Clark states in her deposition, "rumors are just a part of life" in her department, and Clark herself never heard Brazytis use this terminology.  (Filing No. 66 at CM/ECF p. 162.)  Regardless, "joking remarks, 'standing alone, do not provide a sufficient

---

[3]In her unauthenticated documents, Clark includes an instant-message conversation with another UP employee, Remington Gray ("Gray") in which Gray states that "if you were 50 years or older you got demoted."  (Filing No. 66 at CM/ECF p. 338.)  Even if the court considered this unauthenticated document, it is not enough to sustain Clark's claim.  Clark and Gray work in different UP departments and Gray has never supervised Clark or been involved with the decision-making process to hire or demote Clark.  (Filing No. 73-2, Attach. 2.)  Such "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process" are insufficient to sustain Clark's burden of showing age discrimination.  *Saulsberry v. St. Mary's Univ. of Minnesota*, 318 F.3d 862, 867 (8th Cir. 2003) (quotation omitted).

basis for an inference of age discrimination.'" *Wagner*, 2009 WL 2105680 at *5 (quoting *Montgomery v. John Deere & Co.*, 169 F.3d 556, 560-61 (8th Cir. 1999)).

It appears that Clark's entire claims rests on her argument that UP lied regarding her performance issues, and that her age must be the reason for her demotion. Indeed, Clark states that all of her performance reviews were "altered from [the] original" documents, that UP "tampered with" and "falsified" documents, and that no other younger manager was required to do what UP required of her. (Filing No. 64.) The court has carefully reviewed the record and finds that Clark has not submitted any support for these arguments. To survive summary judgment, Clark must substantiate her allegations with more than "speculation, conjecture, or fantasy." *Marquez v. Bridgestone/Firestone, Inc.*, 353 F.3d 1037 (8th Cir. 2004) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)). In light of this, the court finds that the evidence submitted by Clark, both direct and circumstantial, is not sufficient for a reasonable finder of fact to conclude that her age was the cause of her demotion. As such, the court grants UP's Motion for Summary Judgment, denies Clark's Motion for Summary Judgment, and dismisses Clark's ADEA claim in its entirety.

IT IS THEREFORE ORDERED that:

1.   Defendant Union Pacific Railroad's Motion for Summary Judgment (Filing No. 49) is granted as set forth in this Memorandum and Order. All claims against Defendant are dismissed with prejudice;

2.   Plaintiff's Motion for Summary Judgment (Filing No. 63) is denied. All other pending motions are denied as moot;

3.   A separate judgment will be entered in accordance with this Memorandum and Order; and

      4.      The Final Pretrial Conference, scheduled for June 2, 2010, at 10:00 a.m., is cancelled.  The Clerk of the court is directed to provide a copy of this Memorandum and Order to Magistrate Judge Zwart.

DATED this 10th day of May, 2010.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge

---

     *This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.